IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs December 4, 2007

**MARIO MERRITT v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Shelby County**
**No. 02-05448    James M. Lammey, Jr., Judge**

**No. W2007-00534-CCA-R3-PC  - Filed January 22, 2008**

A Shelby County jury convicted the Petitioner, Mario Merritt, of especially aggravated robbery, and the trial court sentenced him to twenty-five years in prison.  The Petitioner filed a petition for post-conviction relief claiming he was not afforded the effective assistance of counsel.  After a hearing, the post-conviction court denied the petition, finding the Petitioner failed to prove that trial counsel was deficient and that any alleged errors caused prejudice.  After a thorough review of the record and applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and DAVID G. HAYES, J., joined.

Juni S. Ganguli, Memphis, Tennessee, for the Appellant, Mario Merritt.

Robert E. Cooper, Jr., Attorney General and Reporter; Michael E. Moore, Solicitor General; Rachel E. Willis, Assistant Attorney General; William L. Gibbons, District Attorney General; Greg Gilbert, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**
**I.  Facts**

On direct appeal, we described the facts underlying the Petitioner's conviction as follows:

On the afternoon of June 21, 2001, Anterius Harden, a "Loss Prevention Security" employee at Goldsmith's Department Store, was on duty at the Southland Mall in Memphis.  Around 5:00 p.m., Harden was monitoring the store from a control panel located in the men's department, when he noticed two men and a woman enter the men's department through the north doors.  According to Harden, the three shoppers

caught his attention because they began selecting clothing without checking the size or price of the items. As Harden watched the trio, he observed one of the men, later identified as the appellant, take several items of clothing, walk past the cash register, and proceed toward the north doors.

Harden immediately intercepted the appellant and identified himself as a "Loss Prevention" employee. Harden was wearing "plain clothes" and a badge around his neck. Upon being confronted, the appellant pulled out a pistol and ordered Harden "to get back, get on the ground." Harden remained standing but stepped aside to allow the appellant to "go out the door." Instead, the appellant ran toward Harden and pointed the gun in his face. Harden stated that when he attempted to grab the gun, he and the appellant "tussled" and the appellant fell back. The appellant, with the gun and merchandise in hand, began backing out of the store. Harden explained that as soon as the appellant pulled out the gun, the second man dropped the merchandise he was holding and ran from the store.

As the appellant was backing out of the store, Gary Sparks, another loss prevention employee, arrived at the north doors. Sparks held the doors to prevent the appellant from leaving. Thereupon, the appellant reached over his shoulder and shot Sparks, striking him in the left shoulder. Afterward, the appellant ran into the parking lot and fled in a vehicle.

Harden took Sparks inside the store and called police, paramedics, and the fire department. Sparks was transported by ambulance to the hospital. Harden spoke with police at the scene and provided them with two videotapes of the incident. One videotape was taken from the podium where he had been standing, and one was from a camera in the security office. At trial, Harden conceded that the videotape from the security office was unclear and difficult to see.

Several days later, an officer returned to the store and spoke with Harden and Sparks. Harden and Sparks were asked to identify the perpetrator from a photographic lineup prepared by police. Harden selected the appellant's photograph from the lineup which showed six individuals. Sparks was unable to identify the appellant from the lineup, explaining that he saw only the back of the appellant's head and the left side of his face. However, both Harden and Sparks identified the appellant at a pretrial hearing and at trial.

At trial, Harden testified that he came face-to-face with the appellant and was able to identify the appellant because of his close proximity to the appellant when the appellant pointed the gun at him. On cross-examination, Harden conceded that his prior testimony regarding the appellant's height was not accurate. However, he stated that the appellant appeared larger at trial, surmising that the appellant had "probably gained a little . . . weight or whatnot."

2

Sparks testified at trial regarding his injuries and showed the jury the scar and disfigurement resulting from the gunshot wound. He related that he continues to have pain and problems with his shoulder, explaining that "[e]very once in awhile it swells up and hurts like when the weather starts acting up." Sparks admitted that he had initially estimated that the perpetrator was five feet, five inches tall, but he explained that the estimate may have been inaccurate because the hat worn by the perpetrator made him appear shorter.

*State v. Mario Merritt*, No. W2003-02868-CCA-R3-CD, 2004 WL 2726030, at *1-2 (Tenn. Crim. App., at Jackson, Nov. 30, 2004) (footnote omitted), *perm. app. denied* (Tenn. Feb. 28, 2005).

The following evidence was presented at the post-conviction hearing: the Petitioner's trial counsel ("Counsel") testified that, at the time of his representation, the Petitioner had three pending cases: the robbery of a Rite-Aid, the rape of two women, and the especially aggravated robbery at Goldsmiths. Counsel represented the Petitioner on the rape charges and the Goldsmith's robbery charge.

Although Counsel was not present at the Petitioner's preliminary hearing, Counsel reviewed a tape of that hearing; however, he did not get the tape transcribed due to time constraints. Counsel stated that he traditionally used the testimony at the preliminary hearing to impeach witnesses at trial, but, in this case, he did not obtain the tape until just prior to trial. Counsel believed, however, that he successfully impeached the witnesses at the Petitioner's trial because he reviewed "pretty complete" discovery.

Counsel testified that he did not specifically instruct his investigator to work on the Goldsmith's robbery case because there was nothing for an investigator to investigate. Counsel recalled that the Petitioner's concern was not that he did not commit the crime but that he only wished to be charged with shoplifting and aggravated assault.

After a discussion with the Petitioner's counsel on the Rite-Aid robbery, Counsel proposed to the Petitioner the possibility of a plea agreement to address all three cases, but the Petitioner refused to plead guilty to the rape charges. Counsel stated that he wished to try the rape case first, as he believed that case was the Petitioner's strongest, but the especially aggravated robbery case trial was set first because the witnesses were from out-of-state. Although he spent much of his time preparing for the rape cases because the Petitioner was adamant about not pleading guilty to those charges, Counsel claimed he was prepared for the Goldsmiths robbery trial. Ultimately, the Petitioner pled guilty to the Rite-Aid robbery, a conviction for which he received twelve years incarceration. The Petitioner then decided to also plead guilty to the rape charges, and he received a fifteen-year sentence for those offenses.

Counsel stated that he met with the Petitioner a number of times, and at the meetings they usually discussed the rape and Goldsmith's robbery charges. Counsel testified that he learned of a

3

videotape of the incident and attempted to view it, but the tape was grainy in his VCR because of a speed problem. Prior to trial, he "brought it up into court . . ." where the Petitioner also viewed the tape. When questioned about whether he filed a motion to suppress the photo identification, Counsel admitted that he did not file such a motion because he did not feel the identification procedures were inappropriate. Counsel stated, however, that he argued at trial the witnesses' identifications of the perpetrator were inconsistent with the appearance of the Petitioner.

On cross-examination, Counsel reiterated that the Petitioner admitted committing the robbery, but he wished for Counsel to focus on reducing the especially aggravated robbery charge into separate charges of shoplifting and aggravated assault. Ultimately, Counsel said that the Petitioner's main problem was that he did not initially wish to settle all his charges simultaneously. Counsel opined that the piecemeal process resulted in a higher total sentence.

The Petitioner testified that he was serving an effective sentence of thirty-seven years. Initially, he received an offer of twenty-seven years, which he declined. The Petitioner stated that Counsel explained the possible sentences he would face if he were convicted of all the charges, and that number was "extraordinarily high." The Petitioner stated that Counsel visited him "a couple of times" while he was housed at the Shelby County jail, and he and Counsel mainly discussed the rape case. He said that, while little time was spent discussing the especially aggravated robbery case, he did tell Counsel that he did not shoot the security guard on purpose but that the gun discharged during a scuffle. The Petitioner stated he was unhappy with Counsel's representation, and he wrote the Board of Professional Responsibility "a couple of times," partly because Counsel did not show him any witness statements until just prior to trial. However, the Petitioner did admit that Counsel cross-examined the witnesses about the identity of the shooter.

On cross-examination, the Petitioner admitted that he wanted to take his case to trial. The State made a "good offer," which Counsel suggested accepting, but the Petitioner refused. The Petitioner stated that he never saw the videotape prior to trial, and, if he had, he would have taken the plea agreement. Counsel described the tape as "blurry," so the Petitioner took his chances at trial.

The post-conviction court then noted that one of the discovery pages explained that the Petitioner viewed the video tape in 2001. The court read, "[The Petitioner] advised [that] the male depicted was not him. He said he was not at the Goldsmiths at the time it was filmed." The Petitioner then stated the investigators were lying in their above referenced statement.

The post-conviction court found the Petitioner's testimony unbelievable and concluded that the Petitioner did not prove Counsel was deficient or that he, the Petitioner, was prejudiced. The court stated that it found the Petitioner to be untruthful when he claimed he had not seen the videotape prior to trial. The post-conviction court denied the petition for post-conviction relief, and it is from this order that the Petitioner now appeals.

## II. Analysis

On appeal, the Petitioner claims that he did not receive the effective assistance of counsel. Specifically, he points to the following instances: (1) Counsel made few and unsubstantial visits, and he did not discuss the facts with the Petitioner; (2) Counsel failed to view the videotape; (3) Counsel failed to file a motion to suppress a photo spread identification; and (4) Counsel failed to obtain a transcript of the preliminary hearing.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. § 40-30-103 (2006). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f) (2006). Upon review, this Court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999); *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9, of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. To prevail on a claim of ineffective

assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (citing *Strickland*, 466 U.S. at 688 (1984)).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland,* 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. *Strickland,* 466 U.S. at 690; *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462. Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. *House*, 44 S.W.3d at 515 (citing *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. *House*, 44 S.W.3d at 515.

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 694; *Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

### 1. Few and Unsubstantial Visits

First, the Petitioner complains that Counsel did not visit with him enough and that he did not discuss the facts of the case with the Petitioner. The post-conviction court found that the testimony from the hearing directly contradicts this. Counsel visited with the Petitioner several times, discussing both the rape and especially aggravated robbery charges. The Petitioner admitted committing the especially aggravated robbery, and he only requested that Counsel attempt to reduce the offense to shoplifting and aggravated assault. As a result of this request, Counsel focused the majority of his attention on the Petitioner's rape charges. As the post-conviction court found, the testimony at the post-conviction hearing simply does not support the Petitioner's argument. The evidence does not preponderate against those findings. The Petitioner has not proven that Counsel was deficient, and he is, therefore, not entitled to relief on this issue.

6

## 2. Videotape

The Petitioner next contends that Counsel failed to view the videotape of the robbery and failed to show the Petitioner the videotape. The post-conviction court found that Counsel viewed the videotape twice. Both times, the images were somewhat blurry. Further, the post-conviction court determined that the Petitioner viewed the videotape and was untruthful in his assertions that he did not do so. Thus, his claim that he would have pled guilty had he seen the tape is unsubstantiated by the evidence. The Petitioner has not proven that Counsel was deficient. The Petitioner is not entitled to relief on this issue.

## 3. Motion to Suppress

Next, the Petitioner argues that Counsel failed to file a motion to suppress the witnesses' photo identification of the Petitioner. In order to find Counsel deficient, we would need to conclude that the Petitioner would have won a motion to suppress. As the post-conviction court found, the Petitioner has not presented evidence, and there is no evidence in the record to support such a conclusion. The Petitioner has failed to prove Counsel was deficient in declining to file such a motion, and, therefore, the Petitioner is not entitled to relief on this issue.

## 4. Transcript of the Preliminary Hearing

Finally, the Petitioner complains that Counsel failed to obtain a transcript of the preliminary hearing. This transcript would have presumably been used to impeach the State's witnesses at trial. We conclude that Counsel was not deficient in failing to obtain a transcript. The post-conviction court found that Counsel listened to a tape of the hearing and cross-examined the State's witnesses at trial after a review of evidence received through discovery. The witnesses were cross-examined on the issues the Petitioner raises. The evidence does not preponderate against those findings. The Petitioner is not entitled to relief on this issue.

## III. Conclusion

We conclude that the Petitioner is not entitled to post-conviction relief because he has not proven that Counsel was deficient. Accordingly, we affirm the judgment of the post-conviction court.

_____
ROBERT W. WEDEMEYER, JUDGE